**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

SHIMON HALBERSAM, as Trustee of the
ZUPNICK FAMILY TRUST 2008 B,

                Plaintiff,

       v.

ALLIANZ LIFE INSURANCE COMPANY OF
NORTH AMERICA,

                Defendant.

Docket No. 1:16-cv-06854 (ARR-ST)

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

LIPSIUS-BENHAIM LAW, LLP
Attorneys for Plaintiff
80-02 Kew Gardens Road, Suite 1030
Kew Gardens, New York 11415
212-981-8440

Of Counsel:

    David BenHaim

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ………………………………………………….. ii

PRELIMINARY STATEMENT ……………………………………………… 1

FACTS

    **A.** ALLIANZ INFLATED THE AMOUNT DUE AND LIED ABOUT IT……… 3

    **B.** ALLIANZ DESCRIMINATED AGAINST HALBERSTAM BY
    REFUSING TO EXTEND TO HIM THE BENEFIT EXTENDED TO
    INSUREDS OF AN ADDITIONALTHIRTY DAYS TO PAY
    THE PREMIUM……………………………………………………… 5

    **C.** ALLIANZ REJECTED THE UNCONDITIONAL OFFER TO PAY
    AND LIED ABOUT THE AMOUNT DUE…………………………….. 6

ARGUMENT

    **A.** MR. HALBERSTAM COULD NOT HAVE KNOWN HOW
    MUCH TO PAY………………………………………………….. 10

    **B.** ALLIANZ PREVENTED TENDER…………………………………. 14

    **C.** THE ACTION IS NOT TIME BARRED……………………………. 22

    **D.** ALLIANZ'S CLAIMS OF STOLI ARE UNSUPPORTED……………… 22

CONCLUSION…………………………………………………………….. 25

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Gen. Life Ins. Co. v. Ellman Sav. Irrevocable Tr.*,
2010 WL 5253611, at *5 (D.N.J. Dec. 17, 2010) ................................................. 23

*Bakeman v. Pooler*, 15 Wend. 637 (N.Y. Sup. Ct. 1836) ..................................... 21

*Insurance Co. v. Smith*, 44 Ohio St. 157, 5 N. E. 417 .......................................... 16

*Jakobovits v. PHL Variable Ins. Co.*, 2018 WL 2291311 (E.D.N.Y. May 18, 2018) ................. 22

*Jakobovits, As Trustee Of The Lite Trust I, v. Alliance Life Insurance Company Of North America*, 2017 WL 3049538 (S.D.N.Y. 2007) ..................................................... 3

*Kenyon v. Nat'l Life Ass'n of Hartford*, 39 A.D. 276, 57 N.Y.S. 60 (4th Dept. 1899) .............. 2, 16

*Kramer v. Phoenix Life Ins. Co.*, 15 N.Y.3d 539, 940 N.E.2d 535, 914 N.Y.S.2d 709 (N.Y. 2010) ......................................................................................... 23

*Lebovits, as Trustee of the Weberman Family Irrevocable Life Insurance Trust v. PHL Variable Insurance Company*, 2016 U.S. Dist. LEXIS 105044 (August 16, 2016) .............. 1

*McMillan v. Farm Bureau Mut. Auto. Ins. Co.*, 282 A.D. 1091, 126 N.Y.S ................................ 17

*Primeau v. Nat'l Life Ass'n*, 28 N.Y.S. 794 (Gen. Term 1894),
*aff'd*, 144 N.Y. 716, 39 N.E. 858 (1895) ...................................................... 3, 16, 17

*Reed v. Provident Sav. Life Assur. Soc. of New York*, 190 N.Y. 111,
82 N.E. 734 (1907) ........................................................................... 2, 16

*Robinson v. Mut. Reserve Life Ins. Co.*, 182 F. 850 (S.D.N.Y. 1910),
*aff'd*, 189 F. 347 (2d Cir. 1911) ............................................................. 2, 16

*Shaw v. Republic Life Ins. Co.*, 69 N.Y. 286 (1877) ........................................... 2, 16

*Sullivan v. Indus. Ben. Ass'n*, 26 N.Y.S. 186 (Gen. Term 1893) ............................... 2, 16

*Swayze v. Mut. Life Ins. Co. of New York*, 32 F.2d 784 (D. Kan. 1929) ......................... 17, 18

*Te Bow v. Washington Life Ins. Co.*, 59 A.D. 310, 69 N.Y.S. 289 (3rd Dept. 1901),
*aff'd*, 172 N.Y. 623, 65 N.E. 1123 (1902) ....................................................................... 2, 16, 20

*Weiss, Trustee of the Regina Weiss Trust, v. Lincoln National Life Insurance Company*,
2016 U.S. Dist. LEXIS 126090 (September 15, 2016) ................................................................. 2

**Statutes**

New York Insurance Law §§ 2123 .......................................................................................... 5, 9
New York Insurance  Law § 3102 (c) ......................................................................................... 14
New York Insurance Law § 3211 ....................................................................................... 2, 9, 15
New York Insurance Law § 3205(b)(1) ...................................................................................... 23
New York Insurance Law § 4224 ...................................................................................... 6, 24, 25
New York Insurance Law § 4226 ............................................................................................... 5

**Treatises**

N.Y. General Counsel Opinions 2-12-2002 and 12-13-2000 ....................................................... 24

*Validity, Construction, and Application of Stranger-Originated Life Insurance Policies*, 91
A.L.R.6th 327 (Originally published in 2014) ........................................................................... 22

## PRELIMINARY STATEMENT

The cross-motions come down to a simple set of uncontested facts:

1.      It is not disputed that Allianz billed Plaintiff (and, in all probability, thousands of other policy holders) between 45% and 85% more than was due.

2.      Prior to the alleged lapse, Plaintiff challenged the amount and asked for the correct amount (August 20, 2012).

3.      Allianz lied to Plaintiff as to the amount and as to company policy regarding extensions to pay (August 20, August 30, September 5).

4.      Plaintiff attempted to reduce the death benefit by payment of a lesser amount (which he would not have had to do if Alliance produced honest and accurate billings). Allianz refused (August 30).

5.      Allianz declared the policy lapsed (September 9).

6.      Plaintiff calls to pay and obtain correct premium amount and Allianz refuses to provide the correct amount of premiums further advising that it would not accept **any** premium in the absence of a reinstatement application and ignores Plaintiff's repeated pleas for the amount of premium due (October 25, 26, 2012).

**What actually happened?**

Allianz asserts Policy lapsed as of September 7, 2012

Allianz demand to insured:    $116,511.94

Actual amount due per Allianz: $ 80,326.54[1]

As a matter of law the Policy did not lapse as an incorrect demand was made by

Allianz (*Lebovits, as Trustee of the Weberman Family Irrevocable Life Insurance Trust v.*

*PHL Variable Insurance Company*, 2016 U.S. Dist. LEXIS 105044 (E.D.N.Y. August 16,

2016); *Weiss, Trustee of the Regina Weiss Trust, v. Lincoln National Life Insurance Company,*

---

[1] Allianz had admitted it overbilled the insured by **45%!!!**.  Plaintiff's expert calculates the actual due $64,721.30 and overbilling of 85%.

2016 U.S. Dist. LEXIS 126090 (E.D.N.Y. September 15, 2016); *Blau v. Allianz*, 2018 WL 949222 (E.D.N.Y.)[2]

Abraham Lincoln is attributed to have defined a hypocrite as "the man who murdered his parents, and then pleaded for mercy on the grounds that he was an orphan."

Allianz refused to accept premium, or even let its insured know the amount of premium, preventing the insured from paying the premium and then comes to this court and begs to void the policy because the insured did not pay premium.

In the simplest form, there is a legal issue which is recognized by Plaintiff and Allianz; may an insurer refuse to provide the amount of premium due and advise that it will not accept payment and then assert the one year limitation provided by Insurance Law § 3211? Allianz asserts anything short of absolute tender of funds results in cancellation pursuant to § 3211. It is submitted that under the law of New York where an insurer refuses to advise the amount of premium due, or advises it will not accept premium, or conditions acceptance of premium on new underwriting, the draconian forfeiture under § 3211 does not occur and an absolute tender is unnecessary. The courts in *Kenyon v. Nat'l Life Ass'n of Hartford*, 39 A.D. 276, 57 N.Y.S. 60 (4th Dept. 1899) and, *Te Bow v. Washington Life Ins. Co.*, 59 A.D. 310, 313, 69 N.Y.S. 289, 290–91 (3rd Dept. 1901), *aff'd*, 172 N.Y. 623, 65 N.E. 1123 (1902), which are exactly on point, state that an insurer cannot hide behind its own wrongful acts.

If *Kenyon*, *TeBow* and *Shaw v. Republic Life Ins. Co.*, 69 N.Y. 286, 292–93 (1877) *Sullivan v. Indus. Ben. Ass'n*, 26 N.Y.S. 186, 189-90 (Gen. Term 1893), *Reed v. Provident Sav. Life Assur. Soc. of New York*, 190 N.Y. 111, 120, 82 N.E. 734, 736–37 (1907), *Robinson v. Mut. Reserve Life Ins. Co.*, 182 F. 850, 857 (S.D.N.Y. 1910), *aff'd*, 189 F. 347 (2d Cir.

---

[2] It is difficult to understand Allianz's repeated assertion in its Memorandum of Law that Allianz was not required to provide a correct amount, or any amount in its notices.

1911), *Primeau v. Nat'l Life Ass'n*, 28 N.Y.S. 794, 798 (Gen. Term 1894), *aff'd*, 144 N.Y. 716, 39 N.E. 858 (1895) are correct, Allianz's motion must be denied and Plaintiff's granted.

Even if this Court would rewrite the law, Allianz's motion must be denied as there remains a factual question of Allianz's deceitful actions and discrimination against Plaintiff. As the Court held in *Jakobovits, As Trustee Of The Lite Trust I, v. Alliance Life Insurance Company Of North America*, 2017 WL 3049538 (S.D.N.Y. 2007), "the question of whether Allianz 'acted honestly and reasonably with respect to its contractual obligations' is a factual determination within the province of a jury."

**FACTS**

**A. ALLIANZ INFLATED THE AMOUNT DUE AND LIED ABOUT IT**

In August of 2012, Allianz demanded, under the threat of lapse, an amount now universally accepted as inflated as by law, Allianz was only permitted to request three months' charges covering July, August and September 2012 and Allianz demanded far more. The amount requested, $116,511.94, seemed too high to Mr. Halberstam so on August 20, 2012, Mr. Halberstam called to ask why he was being invoiced for more than three months' of insurance. Allianz lied and informed him that he is being charged only one month:

| | |
|---|---|
| Shimon: | Yes, I wanna ask you we send me a _____ that I have to pay about $116,000 for September 07, 9/07, we have to pay about 116. |
| Lori: | Okay, so you're asking me, are you telling me that's what you have to pay? |
| Shimon: | No, no, no I wanna ask you that why I have to pay now so much?  Because the last time that I pay is July '07 when I have to pay… |
| Lori: | Okay, well you're on a monthly direct bill and the bills go out every month.  Okay?  So the amount due that went out on your July 8 bill that was due for August 7 was your normal premium.  It's $34,726.67. |
| Shimon: | No but every time normally have to pay to go, every three months.  Let me see, 'til July 7 pay, from July 7 'til August 7 is one month away… |
| Lori: | But you're on a month… |
| Shimon: | … and some from all this to September the second month and from September this June gonna be, _____ this November.  After September it's gonna be then 'bout three months and after the three months… |
| Lori: | Okay, but these aren't three month… |
| Shimon: | …_____ and after that _____ |
| Lori: | Okay, okay, okay.  Well if you want an explanation, these are not three month bills, they're monthly bills.  You're monthly premium is $34,726.67. |
| Shimon: | But when I'm gonna have to pay 116 is after September because the Thursday from September is not a month, now is only two months from July, August is one.  From August to September is the second.  From September 'til November _____ is three months and after the three month, after that they gonna send me a paper that mail that I have to pay the next three month and after the three months… |
| Lori: | But it's not, you're not on three months. |
| Shimon: | [Inaudible] |
| Lori: | Sir? |
| Shimon: | Yes. |
| Lori: | You're not on a three month billing.  That's a quarterly billing.  You're on monthly direct billing.  We're not gonna send you a bill for three months if you're not due for three months.  If you wanna change this to a quarterly billing, we can do that but you're on a monthly billing. |

A frustrated Mr. Halberstam eventually asked his wife for help but Allianz came up with two new lies.  First, Allianz lied and stated that $116,511.94 will cover July, August and September when it now admits that the amount requested intended to cover July, August, September, October, November and part of December.  Allianz also lied about when the Policy went into grace falsely claiming that it went into grace in August when it really went into grace in July.  The exchange went as follows:

4

| Zissy: | Zissy is my name. |
| Lori: | Thank you Zissy, how are you today? |
| Zissy: | Hi. |
| Lori: | Hi. Okay what I was explaining to him was that he received a grace notice that says by September 7 he needs to pay $116,511.94 because he did not pay also for July. This will carry him until October 7 when he will be due again for the monthly premium. |
| Zissy: | Mm-hmm. So we're saying $116 is gonna cover July, August, September. |
| Lori: | Yes ma'am until... |
| Zissy: | [Inaudible] |
| Lori: | Yep and then he'll be due October 7, yes. |
| Zissy: | Mm-hmm. Now when did this enter the grace period? |
| Lori: | The grace letter is, it shows it indicates August 7. |
| Zissy: | Okay, the grace period started then, right? |
| Lori: | Yes. |

As this Court explained in its June 9, 2017 order, "where … the premium amount listed as due in the notice is significantly higher than the amount actually required, the notice runs the danger of deterring a person who could make the actual payment required, but could not make the erroneous higher amount listed, from making the payment necessary to prevent a lapse." Docket Entry 25, Pages 14-15.   By providing Mr. Halberstam with the wrong information, not only did Allianz deter Mr. Halberstam from paying the amount due but also violated New York Insurance Law § 4226 and N.Y. Ins. Law § 2123 both of which prohibit an insurer from providing false premium information and make illegal Allianz's behavior on August 20, 2012.  New York insurance law does allow Allianz to gain from its illegal acts.

### B. ALLIANZ DESCRIMINATED AGAINST HALBERSTAM BY REFUSING TO EXTEND TO HIM THE BENEFIT EXTENDED TO INSUREDS OF AN ADDITIONALTHIRTY DAYS TO PAY THE PREMIUM

On August 30, 2012, Mr. Halberstam requested a seven-day extension to pay the inflated amount.  Although Allianz had in place, at that time, a policy allowing policy owners to pay premiums up to thirty days beyond the end of the grace period, Allianz refused to allow Mr. Halberstam an extra seven days because Allianz had previously targeted the Policy for

termination. In extending some policy owners an additional thirty days to pay but denying Mr. Halberstam even seven days, Allianz not only further deterred Mr. Halberstam from paying but also violated New York Insurance Law § 4224 which prohibits discrimination within a class and provides, in relevant part, as follows:

> (a) No life insurance company doing business in this state and no savings and insurance bank shall: (1) make or permit any unfair discrimination between individuals of the same class and of equal expectation of life, in the amount or payment or return of premiums, or rates charged for policies of life insurance or annuity contracts, or in the dividends or other benefits payable thereon, *or in any of the terms and conditions thereof*;…

After violating the anti-discrimination law in order to deter Mr. Halberstam from making payment, Allianz seeks to take advantage of its illegal behavior which successfully deterred payment. As will be discussed below, New York law rejects such behavior.

## C. ALLIANZ REJECTED THE UNCONDITIONAL OFFER TO PAY AND LIED ABOUT THE AMOUNT DUE

On October 25, 2012, both Shimon and Zissy Halberstam called Allianz seeking to pay the amount due. Allianz (1) would not tell them that amount (2) told the Halberstams that the amount will change; and (3) told the Halberstams not to pay.

Zissy tried multiple times to pay the amount due:

Zissy:     Yeah, Shimon wants to know what premiums he need to pay up in order to keep this policy in force.

Jessie:    I would have to put through a request, this policy actually lapsed back in September. So I would have to put through a request to see what premium's needed to get it reinstated. And what would happen is we would send out a application and he would have to go through underwriting again, and he would have to pay all back premium.

Zissy tried another way:

6

| Zissy: | Yeah. Actually, he's ready to pay up premiums, but he just needs to know how much. |
|---|---|
| Jessie: | Well, he's going to have to be re-underwritten. So, we won't know yet. |
| Zissy: | Mm-hmm. What do you mean, underwritten? |
| Jessie: | Meaning the medical qualifications and the medical rating on the policy would be changed. Or have the opportunity to change. Meaning as this policy was opened back in 2008, isn't so anymore. We need all new information. |

Shimon chimed in, "Do me a favor, we are going to pay the whole premium" and was rejected.

Zissy tried again:

| Zissy: | Right, but when will they have the total sum, how much premiums he needs to pay up? |
|---|---|
| Jessie: | It needs to be underwritten first. You won't get that amount until we receive the paperwork back. The policy is cancelled, so we need paperwork to get restarted. So when we get that paperwork back in, then once that's completed, then we'll send out an offer telling you how much is needed to get it reopened. |
| Zissy: | Mm-hmm. And premiums might change at that point? |
| Jessie: | Yes. |

Allianz would not even tell the Halberstams how much is due thereby foreclosing any opportunity the Halberstams had to try to make a payment and further deterring the Halberstams from paying payment. Allianz now admits that this last statement was another lie which can only be understood as a lie designed to prevent the Halberstams from paying. In reality, Allianz knew the exact amount due and the amount due would not change and should have been disclosed. At deposition in this action, Allianz's corporate designee testified as follows, beginning on page 47, line 1:

```
Q.  Okay.  And  would  a  reinstatement  application
require a check or a payment with it?
```

A. It would, yes.

Q. And would that amount have been the regular premium amount based on the policy that had lapsed?

A. That is correct.

Q. I'm marking as Exhibit 7 a transcript of a call to the Allianz service center that has been produced in discovery by your company.

(Page 47, line 24 into page 48)

Q. Okay. So you understand this call took place sometime in October more than one month after the lapse date, do you understand that?

A. I do.

Q. And it has been my understanding that with the reinstatement application, as you previously testified, a check would be sent based on the prior calculations, correct?

A. A check would be requested along with the reinstatement application.

Q. And the amount of that check would be the amount that was due through the date of the reinstatement application?

A. That is correct.

Q. Okay. If you look on page 4, and this question is asked a few different ways, but she answers it needs to be under -- okay. Do you know -- the paragraph before it says, Zissy, "Right," it's about 10 lines from the bottom,"Right, but when

8

will they have the total sum, how much premiums he
needs to pay up?" See that?
A. Yes.

(page 49)

Q. And Jessie answers, "It needs to be
underwritten first. You won't get that amount
until we receive the paperwork back." Do you see
that?

A. I do see that.

Q. Was that the policy back in 2012 for the
company?

A. No.

Q. Okay. And do you know why she stated this?

A. I do not know.

Allianz's lie that the premiums would change undermined the subsequent
communications to the Halberstams which included amounts due since the Halberstams were
led to believe that the amount would change.

Once again, Allianz not only threw obstacles in front of any attempt to pay, but did so
via blatant misrepresentations, and therefore Allianz violated the New York insurance statutes
prohibiting misleading statements by insurers, including §§ 4226 and 2123.

It is beyond absurd that after violating multiple insurance statutes, lying to the
Halberstams, withholding the amount due and rejecting any attempt to pay, Allianz now
claims that the Halberstams are foreclosed from restoring the Policy because a check was not
tendered.  This is not what New York Insurance Law § 3211 expects and not what the case
law requires.

9

## ARGUMENT

### A.  MR. HALBERSTAM COULD NOT HAVE KNOWN HOW MUCH TO PAY

Allianz raises, as a defense, that Mr. Halberstam could easily have calculated the premium. It is difficult to believe that Allianz makes this statement with a straight face. As noted above, everyone agrees that the amount was incorrect by between 45% and 85%, however even the actuaries, to this day, have not agreed upon the correct amount.

Alliance refused to disclose the amount due and told the Halberstams that the amount cannot even be calculated. Allianz should make up its mind, either it lied in October 2012 when it stated it could not calculate the amount due, or it is misleading the Court when it states that Mr. Halberstam could have figured the correct amount.

Allianz now seems to be arguing that notwithstanding Allianz's game of hide the ball – catch me if you can – Mr. Halberstam should have been able to figure out the amount due by referring to the Policy. This is demonstrably false. Unlike a policy with a fixed premium, the Policy at issue here allowed for flexible premiums to be paid. Allianz performed three different calculations each month, using factors only known to Allianz, to determine the minimum amount due. Only Allianz knew the monthly cost of insurance required,[3] only Allianz knew the interest rate it used for account values, only Allianz knew the accumulated value; only Allianz knew the side account value – all are components of one or more of the tests performed to determine the amount due.

More than that, any attempt by a policy owner to read the Policy and understand the premium obligations would be completely futile. The Grace Period provision identifies one

---

[3] Like all insurers of variable life insurance, Allianz does not disclose its monthly cost of insurance to anyone, ever. It would only provide the maximum cost of insurance but sets the actual cost of insurance in a different amount which is never told to anyone. The only way to get a rough estimate of the monthly cost of insurance is to deconstruct all the Annual Statements, Premium History and Illustrations and compare them to one another and the policy, using proprietary software.

test: the "Net Cash Value" test.  Under that test, "a Grace Period of 61 days starts on the

Monthly Anniversary Date when the Net Cash Value is less than the Monthly Deduction or

when the Net Cash Value is zero or less" (Policy Page 8).  The Net Cash Value is defined as

the Cash Value less any Policy Loan.  The Cash Value is defined as Accumulation Value

described in Policy Values on Page 9, less any Surrender Charge.  To determine the

Accumulation Value, a policy owner would need to conduct the following formula:

| Accumulation Value | On the Policy Date, the Accumulation Value is Net Premium received on or prior to the Policy Date less the first Monthly Deduction.  After the Policy Date, the Accumulation Value on any specified date is equal to (a) plus (b) less (c), where: |
| --- | --- |

(a) is the Accumulation Value on the last Monthly Anniversary Date plus accrued interest on the Accumulation Value from that date to the specified date;

(b) is all Net Premium paid since the last Monthly Anniversary Date plus accrued interest on those Net Premiums from the date of receipt to the specified date; and

(c) is any Gross Partial Surrender Amounts since the last Monthly Anniversary Date, plus interest accrued on the Gross Partial Surrender Amount from the date of Partial Surrender to the specified date.

On the Monthly Anniversary Date, the Accumulation Value will be reduced by the Monthly Deduction and increased by any applicable bonus.

The annual interest rate used to calculate the Accumulation Value will never be less than the guaranteed interest rate shown on the Policy Schedule.  An interest rate in excess of the guaranteed rate may be applied to the unloaned Accumulation Value.

The term "Surrender Charge" used in the definition of Cash Value is undefined but the

Policy contains the following formula to determine the Gross Partial Surrender Amounts used

in the definition of Accumulation Value:

| Partial Surrender | Upon Notice, you may surrender a portion of this policy.  The Partial Surrender is equal to the portion of the Net Cash Value that was surrendered. |
| --- | --- |
| Gross Partial Surrender Amount | The Gross Partial Surrender Amount equals a Partial Surrender plus any applicable Partial Surrender Charge.   The Gross Partial Surrender Amount will be subtracted from the Accumulation Value.  The total of all Gross Partial Surrender Amounts is deducted from the Current Specified Amount in determining the Death Benefit as described in the Payment of Death Benefit provision. |

The Gross Partial Surrender Amount cannot be less than the Minimum Partial Surrender Amount shown on the Policy Schedule.

A Gross Partial Surrender Amount may be necessary to preserve this policy's life insurance qualification pursuant to Section 7702 of the Internal Revenue Code.

| Full Surrender | This policy may be surrendered for its Net Cash Value. If this policy is surrendered within 30 days of a Policy Anniversary, the Net Cash Value will not be less than the Net Cash Value on that Policy Anniversary. |
| --- | --- |

11

To further complicate matters, in order to determine the "Monthly Deduction" the following formula must then be calculated:

| | |
|---|---|
| **Monthly Deduction** | The Monthly Deduction will be subtracted from the Accumulation Value on the Monthly Anniversary Date. |
| | The Monthly Deduction is equal to (a) plus (b) plus (c), where: |
| | (a) is the Monthly Mortality Cost Charge;<br>(b) is the Monthly Rider Cost Charge if any, for attached Riders; and<br>(c) is the Monthly Expense Charge shown on the Policy Schedule. |
| **Monthly Mortality Cost Charge** | The Monthly Mortality Cost Charge for each Policy Month equals the total charges for that month for all Specified Amount Portions. |
| | The charge for a Specified Amount Portion for a Policy Month is equal to (a) multiplied by (b), where: |
| | (a) is the Net Amount at Risk for the Specified Amount Portion for that month; and<br>(b) is the Monthly Mortality Cost Charge rate that applies to the Specified Amount Portion for that month. |
| | The Net Amount at Risk for a Specified Amount Portion for a Policy Month equals (a) less (b), where: |
| | (a) is the Death Benefit associated with the Specified Amount Portion divided by 1.001652; and<br>(b) is the Accumulation Value at the beginning of the Policy Month, before the Monthly Deduction for the month is subtracted. |
| | In determining the Net Amount at Risk, we will first assume that the Accumulation Value is part of the Corridor Death Benefit, if any. Any excess of the Corridor Death Benefit over the Accumulation Value is associated with the Initial Specified Amount. The remaining Accumulation Value would then be allocated to the Initial Specified Amount. If the Accumulation Value is greater than the sum of the Corridor Death Benefit and Initial Specified Amount, we will next assume the Accumulation Value is part of each Specified Amount Increase in order, starting with the first increase. |
| | Any Gross Partial Surrender Amounts are assumed to reduce the Initial Specified Amount first, then each Specified Amount Increase in order, starting with the first increase. |
| | The Monthly Mortality Cost Charge rate for a Specified Amount Portion is based on the Premium Rate Class of the Insured that applied to that Specified Amount Portion. |
| | We may change our Monthly Mortality Cost Charge rates based on our future expectations of investment earnings, mortality, persistency, expenses and taxes. Any change we make will apply to all Specified Amount Portions in the same Premium Rate Class. |
| | The Monthly Mortality Cost Charge rates for standard Premium Rate Classes or better will not be greater than the rates shown in the Table of Guaranteed Maximum Standard Monthly Mortality Cost Charge Rates. Whenever the Death Benefit is equal to the Accumulation Value, the Monthly Mortality Cost Charge is zero. |

It is painfully clear that the above test, one of three which a policy owner is required to perform in order to determine how much to pay, is not even understandable to any policy owner. More than that, most of the variables are not even known or disclosed to the policy

owner and are only known to Allianz including, for example, the Monthly Mortality Cost

Charge, the Net Amount at Risk, the Current Specified Amount among others.

The "Policy Protection Test," formula is listed in the policy as follows:

**Policy Protection Test** This test is calculated on each Monthly Anniversary Date during the Guaranteed Policy Protection Period. The test is met if the result of (a) less (b) less (c) is greater than or equal to the sum of Minimum Monthly Premiums since the Policy Date, where:

(a)  is the sum of premiums paid;
(b)  is the sum of Gross Partial Surrender Amounts; and
(c)  is any Policy Loan.

Minimum Monthly Premiums change if:

1.  you increase or decrease the Current Specified Amount;
2.  you add, change or terminate a Rider; or
3.  the Insured's Premium Rate Class changes.

Another test, identified by Allianz as the "Death Benefit Protection Rider II," would

ask the policy owner to conduct the following test:

**GUARANTEED DEATH BENEFIT TEST** The Guaranteed Death Benefit Test will be met on each Monthly Anniversary Date if the Test Value is greater than or equal to any Policy Loans.

The **Test Value** on the Monthly Anniversary Date will be the value of the calculation below.

The Test Value equals $\{A + B - C\}$ multiplied by D where:

A.  Is the result of (a) minus (b) where:
 (a)  Is the Test Value immediately prior to this calculation, zero on the Policy Date; and
 (b)  Is any Gross Partial Surrender Amounts taken since the prior Monthly Anniversary Date.

B.  Is the result of (a) minus the sum of (c) and (d) where:
 (a)  Is premium applied since the prior Monthly Anniversary Date;
 (b)  Is the lesser of (a) or the result of the Annual Paid Premium Basis minus the Premium Factor Limit;
 (c)  Is Premium Factor A multiplied by (a); and
 (d)  Is Premium Factor B multiplied by (b), but not less than zero.

C.  Is the result of (a) minus the sum of (c) and (d) where:
 (a)  Is the Monthly Test Premium plus the current Monthly Rider Test Premium;
 (b)  Is the lesser of (a) or the result of  the Annual Test Premium Basis minus the Premium Factor Limit;
 (c)  Is Premium Factor A multiplied by (a): and
 (d)  Is Premium Factor B multiplied by (b), but not less than zero.

D.  Is the Monthly Guaranteed Death Benefit Test Factor.

Premium Factor A, Premium Factor B, Premium Factor Limit, and Monthly Guaranteed Death Benefit Test Factors are shown on the Policy Schedule.

In order to conduct this algebraic algorithm, the policy owner would need to know

what Allianz currently describes as the side account value and must also determine the various

factors which the Policy states are as follows:

All information on this page pertains to the Death Benefit Protection Rider II

Monthly Guaranteed Death Benefit Test Factors

| Policy Year | Monthly Guaranteed Death Benefit Test Factors |
|-------------|-----------------------------------------------|
| 1-10 | 1.008734594 |
| 11-20 | 1.009112468 |
| 21+ | 1.011714917 |

Monthly Rider Test Premiums
Current $0.00
Guaranteed $0.00

Premium Factor A: 35%
Premium Factor B: 15%
Premium Factor Limit: $555,600.00

Not only are such policy terms a direct violation of N.Y. Ins. Law § 3102 (c), requiring policy terms to be understandable to the average consumer, the calculations can only be performed using information known only to Allianz.

It is submitted that there are few people, if there are any, in this courthouse who could calculate the premium on their own. Shimon and Zissy Halberstams did everything within their powers to determine the amount due including, on August 20, asking Allianz to clarify that the amount listed in the August notice represents three months' charges and asking Allianz on October 25 to simply reveal the amount. Allianz responded with a series of lies designed to cause the Policy to terminate and never revealed the amount, thereby actively preventing the Halberstams from tendering payment.

### B. ALLIANZ PREVENTED TENDER

Allianz prevented the Halberstams from paying premiums by advising the Halberstams that payment will not be accepted without new underwriting and also by refusing to disclose the amount due. As cited, at length, the Prevention Doctrine, and specifically the

manner in which courts have implemented the doctrine in the insurance context, excuse any failure to tender a check.

This Court already ruled that an offer to pay coupled with a rejection, absolves the Halberstams from tendering a check. In Allianz's motion to dismiss, Allianz argued that tender of a check within a year is mandatory under Insurance Law § 3211,

> Missing from plaintiff's allegations is any suggestion that the policy owner submitted a premium payment at the time the Policy entered the grace period in August 2012 or at any time during the nearly five years thereafter, see generally Compl., thus precluding its claims under New York law.

Docket Entry 18-1, page 12.

In opposing the motion to dismiss, Halberstam pointed to the telephone calls during which the Halberstams attempted to pay and were denied the opportunity to do so. In reply, Allianz argued, "Nor does plaintiff allege that anyone ever actually paid any amount to Allianz, either before the lapse or at any time thereafter" (Docket Entry 23, page 5).

This Court already rejected the same argument that Allianz now makes and held:

> Defendant argues that regardless of the contents of the notice, the policy automatically lapsed after a year of nonpayment as provided in New York Insurance Law § 3211. See Def.'s Mem. at 12 (citing N.Y. Ins. Law § 3211(a)(1)). However, plaintiff's complaint alleges that "[t]he [t]rust offered to make all payments due and owing on the [p]olicy on November 1, 2012 [within the one-year payment period] . . . [but] Allianz refused to unconditionally accept payment and place the [p]olicy in active status." Am. Compl. ¶ 51. This factual allegation is sufficient to support an inference that plaintiff tendered payment in a manner that would prohibit the application of the one-year limitation rule.

(Docket Entry 25, page 15)

Moreover, it is not only the law of the case that Allianz's prevention of a tender prohibits the application of the one-year limitation rule, this Court's decision is well grounded in the case law. Without repeating pages 23-28 of Halberstam's memorandum of law in support of his motion for summary judgment in full, every decision which has looked at this

issue reached the same exact result. *Shaw v. Republic Life Ins. Co.*, 69 N.Y. 286, 292–93 (1877) ("There is no doubt that the defendant repudiated all obligation to the plaintiff, and so declared to her.  It would have been a useless act for her after that to have sought the defendant and made offer to pay the annual premium."); *Sullivan v. Indus. Ben. Ass'n*, 26 N.Y.S. 186, 189-90 (Gen. Term 1893) ("The plaintiff, a short time before this date, called on Mr. Sperry, who had given her the receipt for the first premium, and offered to pay the premium soon becoming due.  He declined to receive it…Ordinarily a tender is not necessary when the acts and conduct of the other party indicate that it will be futile…A company cannot take advantage of a forfeiture that it encourages."); *Reed v. Provident Sav. Life Assur. Soc. of New York*, 190 N.Y. 111, 120, 82 N.E. 734, 736–37 (1907) ("The refusal of the company to accept the premium due in January, 1895, was a perfectly good reason for not offering to pay subsequent premiums."); *Robinson v. Mut. Reserve Life Ins. Co.*, 182 F. 850, 857 (S.D.N.Y. 1910), *aff'd*, 189 F. 347 (2d Cir. 1911) ("There was no obligation upon the part of the insured after his policy was declared lapsed by the company because of his refusal to pay an invalid assessment to tender subsequent dues or assessments."); *Primeau v. Nat'l Life Ass'n*, 28 N.Y.S. 794, 798 (Gen. Term 1894), *aff'd*, 144 N.Y. 716, 39 N.E. 858 (1895) ("The defendant informed the plaintiff that his policy had lapsed and been canceled, made no further calls upon him, and substantially admits that, if money for subsequent premiums had been tendered, it would not have received it.  We think that a tender for subsequent premiums was not necessary."); *Kenyon v. Nat'l Life Ass'n of Hartford*, 39 A.D. 276, 57 N.Y.S. 60 (4th Dept. 1899); *Te Bow v. Washington Life Ins. Co.*, 59 A.D. 310, 313, 69 N.Y.S. 289, 290–91 (3rd Dept. 1901), *aff'd*, 172 N.Y. 623, 65 N.E. 1123 (1902).

*Kenyon* and *Te Bow* are particularly instructive. In *Kenyon*, the Court ruled that by failing to disclose the premium amount, an amount known only to the insurer, the policy cannot terminate for failure to tender premiums. (See, pages 25-27 of plaintiff's moving brief where *Kenyon* is discussed at length.) In *Te Bow*, the Court ruled that if an insurer conditions acceptance payment of premium upon a reinstatement and new underwriting, the policy cannot terminate for failure to tender premiums. (See. Pages 27-28 of plaintiff's moving brief where *Te Bow* is discussed in greater detail.)

The only two relevant insurance law decisions cited by Allianz in support of its motion for summary judgment ruled the same exact way. In support of this motion, Allianz cites to two insurance decisions on topic, one from New York and another from Kansas. The Third Department, reviewing the lapse of an auto collision policy in *McMillan v. Farm Bureau Mut. Auto. Ins. Co.*, 282 A.D. 1091, 1092, 126 N.Y.S. 436, 437–38 (3rd Dept. 1953) specifically ruled that an offer to pay, even without a tender, may suffice:

> The plaintiff not having paid **or offered to pay** any additional premium in any amount, the notice of cancellation remained in effect. **What rights the plaintiff would have had, if he had offered to pay the amount which was owing according to his version of the agreement, we need not now consider since concededly nothing was offered.**

(emphasis supplied).

In *Swayze v. Mut. Life Ins. Co. of New York*, 32 F.2d 784, 788 (D. Kan. 1929), decided under Kansas law (or Federal common law), the court first found the statutorily required notice to be sufficient and then held that in any event, "[f]or more than three years the insured made **no effort to pay** or tender any premiums under this policy, **nor did he make any inquiry** concerning the policy." Again, the Court found that either a tender or an effort to pay or an inquiry would have sufficed but the policy owner did not do any of those three. Here,

even if there was no tender, there was considerable effort to pay and many inquiries – so many that the Allianz's employees complained to one another about all the inquiries:

| | |
|---|---|
| Lori: | That guy infuriates me. |
| Dean: | Hi Lori. |
| Lori: | Hey, Dean. Just talked with Jeff about this guy. This guy really should not be allowed to call in here. Can you take a look at the policy, please? |
| Dean: | Oh, Zupnick? |
| Lori: | Yep. |
| Dean: | Oh. |
| Lori: | Shimon's on the phone. He wants to know how much we can decrease the face amount and the premium. And I said to him, it's in grace, we can't run an illustration. He wants me to take a calculated guess. You mean you can't tell me if we go down to $2 million how much approximately my premium's going to be? |
| Dean: | What's the number? |
| Lori: | It is 60029322. It's just, like, pay the damn premium. |
| Dean: | Just looking at all of the notes. |
| Lori: | That'll take an hour. Do you know somebody talked to this guy three times yesterday? And I counted six times one other time. |
| Dean: | So he's looking at $2 million? |
| Lori: | I don't know, he just threw out… |
| Dean: | [inaudible]. |
| Lori: | …the different figures. He's just looking at some different figures. |
| Dean: | Well, one-fourth the death benefit would be approximately one-fourth the premium. So I'd say nine grand a month. |
| Lori: | For $2 million? |
| Dean: | Yeah. |

Unlike *Swayze*, our matter is not governed by Kansas law (and Federal common law no longer applies to State law issues) and deals with a statutorily deficient notice but in any event, the decision in *Swayze* supports Halberstams' position here that an offer to pay premiums is as effective as actual tender.

It is important to note the difference between "reinstatement" and what Shimon Halberstam seeks by way of this action. Allianz's usage of the term "reinstatement" of the Policy is misleading. In this action, Shimon Halberstam seeks to <u>restore</u> the policy to active

18

status. Reinstatement, a term defined in the Policy, is something entirely different and applying for reinstatement is no different than applying for a brand new policy and offers no advantages over applying for a new policy. Applying for reinstatement requires new applications, new medicals, new underwriting and

The Policy, on page 9, describes Reinstatement as follows:

### PREMIUMS (continued)

**Reinstatement of Lapsed Policy**

If this policy terminates due to Lapse, this policy may be Reinstated. To Reinstate this policy, the following conditions must be met.

1. Notice for reinstatement must be made within three years from the date of Lapse and before the Insured's Maximum Coverage Age shown on the Policy Schedule.
2. The Insured must still be insurable pursuant to our underwriting standards.
3. If any Policy Loans existed when this policy Lapsed, they must be repaid or Reinstated with all loan interest that accrued to the date of Lapse.
4. A premium payment sufficient to cover the Monthly Deductions due when this policy Lapsed and to keep this policy in force for at least two months from the date of reinstatement must be made.

The Accumulation Value of the Reinstated policy will be equal to the Accumulation Value at the date of Lapse, plus the Net Premium you pay at reinstatement. The amount of loans on the Reinstated policy will be equal to the Policy Loan on the date of Lapse plus loan interest that accrued to the date of Lapse.

The Surrender Charges shown on the Policy Schedule may still be in effect, with the Policy Year being determined as if this policy had never Lapsed.

Any bonus payable is calculated based on the Policy Year as if this policy has never Lapsed. Any premium requirements for the years in which the Policy is Lapsed will be equal to zero.

The reinstatement will be effective as of the Monthly Anniversary Date following the date of our approval of the application for reinstatement.

A reinstatement also allows the insurer to contest the policy anew:

**Contestability**

This policy and any attached Riders or Endorsements were issued based on the information you provided in the application. Any misrepresentations on the application may cause this policy to be voided or rescinded, or a claim to be denied. After this policy and any attached Riders or Endorsements have been in effect during the Insured's lifetime for a period of two years from the Policy Date, this policy shall become Incontestable as to a misstatement made in the application. A reinstatement of this contract will be incontestable as to material misstatements in the reinstatement application after being in force during the Insured's lifetime for two years from the date of our approval of the application for reinstatement. After any Specified Amount Increase has been in effect for two years from the date the increase became effective, the increased amount will be incontestable, as to a misstatement made in the application for the increase. This provision does not apply to any Rider providing benefits specifically for disability or death by accident.

Policy, Page 13

When Shimon and Zissy Halberstam, on October 25, 2012, offered Allianz every penny owed, Allianz refused to accept payment and instead falsely told the Halberstams that the amount can only be determined after submission of a reinstatement application which would include full underwriting. Allianz also threatened that the reinstatement process was a long and complicated one and that as the insured's age has changed, the Policy was not even qualified for reinstatement. On October 25, 2012 Allianz informed Zissy as follows:

> Zissy: Yeah. Actually, he's ready to pay up premiums, but he just needs to know how much.
>
> Jessie: Well, he's going to have to be re-underwritten. So, we won't know yet.
>
> Zissy: Mm-hmm. What do you mean, underwritten?
>
> Jessie: Meaning the medical qualifications and the medical rating on the policy would be changed. Or have the opportunity to change. Meaning as this policy was opened back in 2008, isn't so anymore. We need all new information.
>
> Zissy: Mm-hmm. And if the medical condition didn't change?
>
> Jessie: But their age has.

Zissy: Is this a lot of paperwork?

Jessie: Yes.

As the Policy had not yet lapsed (as the August notice was deficient), Allianz was required to unconditionally accept the premiums offered and was unjustified in requiring a reinstatement procedure, which includes new medical underwriting. ,As the Court held in *Te Bow v. Washington Life Ins. Co.*, 59 A.D. 310, 313, 69 N.Y.S. 289, 290–91 (3rd Dept. 1901), *aff'd*, 172 N.Y. 623, 65 N.E. 1123 (1902), discussed more fully on pages 27-28 of Halberstam's memorandum of law in support of his motion for summary judgment, "A

declaration that a policy had lapsed, and can be reinstated by furnishing a satisfactory medical certificate [i.e., new underwriting], imports of necessity a denial of the right to reinstatement except upon the condition named.   With the unauthorized cancellation of the brandished policy, and a refusal to accept the premium except upon a condition which was unauthorized [i.e., reinstatement application], the authorities are uniform to the effect that the defendant is estopped from claiming as a defense to this action that the premium has not been paid."

In any event, long before the policy lapsed, Allianz had already decided that this Policy cannot be reinstated because Allianz suspected that the Policy was owned by investors (whose deeper pockets usually prevent policies from lapsing at the same rate non-investor policies lapse).   Allianz would have never approved a reinstatement of the policy. SMF 33-34.

Allianz primarily relies on a non-insurance law decision, the 1836 New York Supreme Court decision of *Bakeman v. Pooler*, 15 Wend. 637 (N.Y.  Sup. Ct. 1836), for the proposition that in order to tender money, the money must be presented in a bag, not a pocket.   But the *Bakeman* court, after a jury trial, recognized that had the creditor intimated that he would refuse the tender, the tender would be exempted.   The Oswego County jury in *Bakeman* concluded that the creditor "can hardly be said to have intimated that he would not receive the money."   Here, Allianz more than intimated that it would not receive the premiums, it stated in no uncertain terms, on more than one occasion that Shimon Halberstam must reapply for coverage and that Allianz would not accept premiums without underwriting approval.   Allianz would not even tell the Halberstams the premium amount.   Instead, Allianz contended that the premium amount can only be determined after full medical underwriting.   Here, unlike in *Bakeman*, Allianz has nothing to offer a jury or fact finder to suggest otherwise.

### C.  THE ACTION IS NOT TIME BARRED

Allianz's desperate statute of limitations argument was already denied on Allianz's motion to dismiss on June 9, 2017 (Docket Entry 25, page 16, "III. The Statute of Limitations Has Not Expired").  In any event, the argument is nonsensical.  The controversy arose in September 2012 when the Policy was declared lapsed and this action was commenced in September 2016, within the six year statute of limitations.  *Jakobovits v. PHL Variable Ins. Co.*, 2018 WL 2291311 (E.D.N.Y. May 18, 2018) does not hold otherwise.  In *Jakobovits,* the Court ruled that the cause of action accrued at the time of the faulty lapse notice, not, as Allianz claims, from a defective grace notice which was paid in time.  Here, the controversy arose at the time Allianz sent a lapse notice in September of 2012 even though the policy had not lapsed.

### D.    ALLIANZ'S CLAIMS OF STOLI ARE UNSUPPORTED

STOLI stands for Stranger Originated Life Insurance and refers to life insurance policies for which a stranger pays the premiums and reaps the benefit from day one. It does not refer to policies procured by the family and then sold to someone else. See, generally, *Validity, Construction, and Application of Stranger-Originated Life Insurance Policies*, 91 A.L.R.6th 327 (Originally published in 2014).  The manner in which Shimon Halberstam came to be the trustee of the trust is laid out in Halberstam's motion for summary judgment and supporting papers.  His first involvement in the Policy came in June of 2008, a few months after the issuance of the policy is April of 2008.  As Exhibit B to the Anderson Affidavit ("Premium History") demonstrates, Halberstam's first payment (Exhibit A to Halberstam Affirmation) was the fifth payment made on the Policy.  Someone other than Halberstam made the first four payments.  To the extent Shimon Halberstam testified

otherwise, the deposition has no probative value as Shimon was not under oath or subject to the penalty of perjury, could not even understand the oath, and stated that he was under a cocktail of medications which affected his ability to testify. A copy of the beginning of the transcript is attached to the BenHaim Affirmation in Opposition as Exhibit A.

In any event, the STOLI claims, like many other legally irrelevant or unsupported claims made by Allianz in support of the motion, do not touch upon any of the legal issues necessary to determine the cross-motions for summary judgment. Even had Halberstam been involved on day one, STOLI was explicitly sanctioned in New York under Insurance Law § 3205(b)(1), "Any person of lawful age may on his own initiative procure or effect a contract of insurance upon his own person for the benefit of any person, firm, association or corporation. Nothing herein shall be deemed to prohibit the immediate transfer or assignment of a contract so procured or effectuated." See, *Kramer v. Phoenix Life Ins. Co.,* 15 N.Y.3d 539, 940 N.E.2d 535, 914 N.Y.S.2d 709 (N.Y. 2010).

The only reason STOLI plays any role in this matter is in explaining why Allianz targeted the policy for termination in July of 2009. Allianz's repeated misstatements to the Halberstams, its refusal to reveal the premium amount and its refusal to accept premiums from the Halberstams in 2012 was not the result of shoddy customer service – it was a scheme designed to cause the policy to terminate because in 2009 Allianz wrongly suspected that the policy was STOLI[4].

What is clear, though, is that Allianz violated a bevy of insurance statutes in its effort to cause the termination of the policy, including anti-discrimination statutes and statutes prohibiting misleading statements by insurers.

---

[4] Insurers first embraced STOLI for their high premiums but eventually soured on such policies because ordinary consumers eventually give up on policies and allow them to lapse while investors, ordinarily, do not. *Am. Gen. Life Ins. Co. v. Ellman Sav. Irrevocable Tr.,* 2010 WL 5253611, at *5 (D.N.J. Dec. 17, 2010).

Allianz discriminated against Halberstam as Allianz allowed some policy owner an extra thirty days beyond the end of the grace period to pay premiums but denied Shimon Halberstam an extra seven days. New York Insurance Law § 4224, provides in relevant part:

> (a) No life insurance company doing business in this state and no savings and insurance bank shall: (1) make or permit any unfair discrimination between individuals of the same class and of equal expectation of life, in the amount or payment or return of premiums, or rates charged for policies of life insurance or annuity contracts, or in the dividends or other benefits payable thereon, *or in any of the terms and conditions thereof*;...
>
> (b) No insurer doing in this state the business of accident and health insurance, as specified in paragraph three of subsection (a) of section one thousand one hundred thirteen of this chapter, and no officer or agent of such insurer and no licensed insurance broker, and no employee or other representative of such insurer, agent or broker shall: (1) make or permit any unfair discrimination between individuals of the same class in the amount of premiums, policy fees, or rates charged for any policy of accident and health insurance, or in the benefits payable thereon*, or in any of the terms or conditions of such policies, or in any other manner whatsoever;*

The statute prohibits discrimination within a risk class "in any of the terms or conditions of such policies, or in any other manner whatsoever."

In fact, the New York Department of Insurance has ruled that New York Insurance Law § 4224 applies to extra-contractual benefits such as allowing premiums to be paid by credit card. See N.Y. General Counsel Opinions 2-12-2002 and 12-13-2000. In an opinion dated July 2, 2003 , the Department of Insurance explained:

> By its terms, [N.Y. Ins. Law § 4224] is designed to ensure that equal terms are fixed in policies to policyholders of like classes. In effect, this serves to prohibit such practices as hidden rebates or preferential treatment with respect to the cost of the policy or benefits allowed so that all policyholders that fall within the same class will pay alike and be treated alike.
>
> The Department has stated that under N.Y. Ins. Law § 4224(a)(1) a class may appropriately be all applicants for, and insureds under, a particular policy. See N.Y. General Counsel Opinions 2-12-2002 and 12-13-2000. In the inquirer's letter, the inquirer asks why initial premiums and renewal premiums are "in the same class." However, it is not the premiums that constitute a class but, rather, the applicants for and insureds under a particular policy. Accordingly, because

24

all insureds who are covered under the same product constitute a class, they must be treated alike. **If premium payment by credit card is permitted only for new policies and not for renewals, or vice versa, the members of the class would not be treated equally and there would be a violation of the statute.** (emphasis supplied)

By allowing some policy owners an additional thirty days but denying that same right to Halberstam, Allianz violated New York Insurance Law § 4224. See, Anderson Deposition transcript, p. 44-47. This Court should not permit Allianz to benefit from its blatant abuses of New York insurance law.

## CONCLUSION

For all of the foregoing reasons, it is respectfully request that this Court declare the Policy in good standing and grant plaintiff such other relief and this court deems proper.

Dated: New York, New York
       June 14, 2018

LIPSIUS – BENHAIM LAW LLP
Attorneys for Plaintiff

By: _____
       David BenHaim
    80-02 Kew Gardens Rd. Suite 1030
    Kew Gardens, NY 11415
    212-981-8440