UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

Shimon Halberstam, as Trustee of the Zupnick Family Trust 2008 B,

       *Plaintiff*,

– against –

Allianz Life Insurance Company of North America,

       *Defendant*.

1:16-CV-6854 (ARR) (ST)

**Opinion & Order**

---

ROSS, United States District Judge:

In this case, the plaintiff is suing for a declaratory judgment that a certain life-insurance policy, issued by the defendant and owned by a trust of which the plaintiff is both trustee and beneficiary, remains in effect. Despite the variety of issues that the parties have briefed, the *material* facts are undisputed. The defendant insisted upon performance by the plaintiff that went beyond the terms of the policy. Accordingly, the defendant cannot rely on the plaintiff's subsequent failure to tender premiums to justify its termination of their contract. The plaintiff is entitled to summary judgment.

## BACKGROUND

The policy around which this case revolves was issued in April 2008 by the defendant, on the life of one Dora Zupnick. Def.'s 56.1 Statement ¶ 1, ECF No. 48-2; Pl.'s 56.1 Statement ¶ 1, ECF No. 52-2.[1] The policy was issued to Abraham Zupnick, her son, as trustee of the Zupnick Family Trust 2008 B, the owner and beneficiary of the policy. Def.'s 56.1 Statement ¶¶ 2–3; Pl.'s 56.1 Statement ¶¶ 2, 5. At some point, the plaintiff began

---

[1] All citations to the parties' Rule 56.1 statements pertain, unless otherwise noted, to facts that the parties do not dispute.

1

making premium payments on the policy. Pl.'s 56.1 Statement ¶ 11.[2] In 2010, the plaintiff and another man replaced Abraham Zupnick as trustee, and in 2011 the plaintiff became the sole trustee of the trust. Def.'s 56.1 Statement ¶ 3. The plaintiff also became the primary beneficiary of the trust. Pl.'s 56.1 Statement ¶ 10. The plaintiff is not related to the Zupnicks (Def.'s 56.1 Statement ¶ 5); rather, for him, the life-insurance policy is an investment (*id.* ¶ 16; Pl.'s 56.1 Statement ¶ 9). The plaintiff remains the sole trustee of the trust today. *See* Def.'s 56.1 Statement ¶ 4.

The policy does not simply require a fixed premium payment each month; instead, it "provides a policy owner flexibility to determine certain aspects of coverage, including the timing and amount of premiums it will submit to Allianz within limits set by the terms of the Policy." *Id.* ¶ 6; *see also* Pl.'s 56.1 Statement ¶ 12. Whether the policyholder has paid sufficient premium to keep the policy in force is determined by three different tests. Def.'s 56.1 Statement ¶ 8; Pl.'s 56.1 Statement ¶ 14. Under the policy, the defendant evaluates each of the three tests every month; if all three tests fail at once, the policy enters a grace period. Def.'s 56.1 Statement ¶ 8; Pl.'s 56.1 Statement ¶ 14. The grace period lasts sixty-one days, during which the policyholder may make "[a] premium payment sufficient to keep [the] policy in force for three months"; if the policyholder fails to do so "prior to the last day of the Grace Period," the policy lapses. Policy 4191, ECF No. 48-4; *accord* Def.'s 56.1 Statement ¶ 9.

Once the policy lapses, it may be reinstated upon notice made by the policyholder within three years, provided that the insured is still "insurable pursuant to [Allianz's] underwriting standards." Def.'s 56.1 Statement ¶ 30. Although it was not formally part of the contract, at all relevant times the defendant had a practice of accepting premium payments

---

[2] The exact date when the plaintiff first became financially involved with the policy is disputed and irrelevant.

from at least some policyholders within thirty days of when their policy would have lapsed without requiring a new underwriting of the insured. Def.'s Add'l 56.1 Statement ¶ 62, ECF No. 53-1. In February 2010, however, the defendant specifically instructed its underwriting staff not to "auto reinstate" certain policies, including the policy at issue here. Pl.'s 56.1 Statement ¶ 33.

The three tests under the policy all relate to how much premium has been paid: Under one test, the policy would remain in force as long as the policyholder made premium payments equal to at least $34,726.67 per month. *See* Policy 4165, 4191. That test, however, applied only for the first five years of the policy—that is, from April 2008 until April 2013. *See id.* Under a second test, the policy remains in force as long as the policyholder makes sufficient premium payments to maintain a positive balance after Allianz takes its monthly costs and fees. *See* Policy 4165–66, 4187–94. And under the third test, the policy remains in force as long as the policyholder makes sufficient premium payments to maintain a positive balance in a "side account" after Allianz recalculates the "Test Value"—a complex process that includes the subtraction of a "Monthly Test Premium," whose value changes every year according to a schedule set forth in the contract. *See* Policy 4168–69, 4185–86; Pl.'s 56.1 Statement ¶ 16. The policy at issue here failed all three tests on eight separate occasions between 2008 and 2012. Def.'s 56.1 Statement ¶ 22.

On July 7, 2012, the policy failed all three tests and entered the grace period. Pl.'s 56.1 Statement ¶ 17. On August 7, 2012, the defendant sent the plaintiff a grace notice, informing him that the policy would lapse unless a premium payment of $116,511.94 was paid by September 7, 2012. Def.'s 56.1 Statement ¶ 25; Pl.'s 56.1 Statement ¶ 18. Neither party has conclusively explained how this dollar amount was calculated, but it represented more than

3

enough premium for the policy to avoid failing at least one test until November 7 at the earliest. *See* Pl.'s 56.1 Statement ¶ 23.[3]

On August 20, 2012, the plaintiff called the defendant to ask why he had "to pay now so much." Call Trs. 4079, ECF No. 48-13. After some confusion, the defendant's representative repeatedly told the plaintiff—and the plaintiff's wife, Zissy Halberstam, who had joined the call—that the $116,511.94 represented sufficient premium to carry the policy until October 7. *Id.* at 4083–87.

On September 5, 2012, the plaintiff called the defendant to request a one-week extension of the payment deadline. Def.'s 56.1 Statement ¶ 28; Pl.'s 56.1 Statement ¶ 29. The defendant's representative told him that she "can't give [him] an extension but if the policy lapses, as long as [he] sen[t] the premium in within 30 days of the lapse date [the defendant would] auto-reinstate it, so [he] just need[ed] to get that money in as soon as possible." Call Trs. 4108. But then she corrected herself: "Or actually, for reinstatement we have to contact somebody else. I stand corrected on that one." *Id.* She then told him that "[a]s long as it's postmarked by [September 7] . . . it will be fine." *Id.* at 4109. Finally, after apparently discussing the issue with her manager (*see id.* at 4109–10), she told the plaintiff that, "upon further investigation, . . . [t]he premium actually needs to be in [the defendant's] office by the 7th." *Id.* at 4110.

On September 9, 2012, the defendant sent the plaintiff a notice stating that the policy had lapsed. Def.'s 56.1 Statement ¶ 29; Pl.'s 56.1 Statement ¶ 32.

On October 25, 2012, the Halberstams called the defendant to find out "what premiums [the plaintiff] need[ed] to pay up in order to keep [the] policy in force."

---

[3] The plaintiff asserts that $116,511.94 was enough premium for the policy to avoid failing at least one test until December 7 (*see* Pl.'s 56.1 Statement ¶ 20), but that is disputed (*see* Def.'s 56.1 Response ¶ 20, ECF No. 53-1).

4

Halberstam Aff., Ex. F, at 1, ECF No. 52-5. The defendant's representative informed them that because the policy had lapsed, the defendant would need to prepare a reinstatement application for the plaintiff to fill out. *Id.* And—evidently incorrectly (*see* BenHaim Aff., Ex. A, at 49, ECF No. 52-3)—she told them that the amount of premium that the trust owed wouldn't be known until after the defendant had received and processed the completed reinstatement application (Halberstam Aff., Ex. F, at 4). The Halberstams accordingly requested that an application be sent to them. *Id.* at 3–4.

The following day, the plaintiff again called the defendant, again seeking to find out the amount of premium that he would have to pay to reinstate the policy. Pl.'s 56.1 Statement ¶ 37. The plaintiff was told that that information was being calculated and would be sent to him with the reinstatement paperwork that he had requested. *Id.*

Sure enough, the plaintiff received a letter from the defendant dated November 1, 2012, enclosing the reinstatement application and stating that "[i]n order to reinstate [the] policy," he had to return the application and "a check for $181,260.46." *Id.* ¶ 38. The letter continued: "After we receive the check, we will review the application to determine whether you are still insurable by our standards. The premium received will be credited only upon approval of reinstatement. We may need additional information regarding your medical condition." *Id.* And it warned: "**This policy is not in effect and you do not have coverage under it until . . . you have been approved for reinstatement.**" *Id.*

At least two additional reinstatement applications, which also stated the amounts purportedly owed under the policy, were sent by the defendant—one to a representative of the plaintiff on December 19, 2012, and another to the trust on December 5, 2014. Def.'s 56.1 Statement ¶¶ 32–33. No reinstatement application was ever submitted, nor were any further premium payments made. *Id.* ¶¶ 34–35.

5

The plaintiff filed this action, seeking a declaratory judgment that the policy is still in effect, in New York Supreme Court, Kings County, on September 19, 2016. Summons & Compl. 6, ECF No. 1-1. The defendant removed it to this court on the basis of diversity jurisdiction on December 12, 2016. Notice of Removal 1, ECF No. 1. On June 9, 2017, on motion by the defendant, I dismissed most of the claims but allowed the case to proceed with respect to the claims that "the notice stated the incorrect amount due" and that "premiums were fully paid at the time of the [purported] lapse." Op. & Order 17, ECF No. 25. The parties then proceeded to discovery, and each now moves for summary judgment.

## DISCUSSION

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material where it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[W]hen both parties move for summary judgment, . . . each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

The crux of the defendant's argument is that the plaintiff has not paid premium on the policy since 2012, and thus the policy has lapsed. Def.'s Br. 9, ECF No. 48-1. And the defendant argues that the amount stated on the grace notice that the plaintiff received in August 2012 is "irrelevant," because a grace notice is legally required only to terminate a life-insurance policy within one year of default, and here it has been several years since premiums were paid. *Id.* at 10.

In contrast, the plaintiff argues that the policy did not lapse in 2012 because the grace notice that the defendant sent him was "void on account of the inflated demand." Pl.'s Br. 2,

ECF No. 52-1. And because the defendant then wrongfully "informed [him] that [it] [would] not accept premiums or conditioned acceptance [of premiums] upon underwriting or refused to divulge the amount due," the plaintiff argues, he was excused from paying further premium. *Id.*

A.  **The insurance policy remained in force throughout 2012, because the grace notice was legally insufficient.**

Under New York law,[4] policyholders of life-insurance policies with variable premiums, like the policy in this case, are:

> entitled to a sixty-one day grace period, beginning on the day when the insurer determines that the policy's net cash surrender value is insufficient to pay the total charges necessary to keep the policy in force for one month from that day, within which to pay sufficient premium to keep the policy in force for three months from the date the insufficiency was determined.

N.Y. Ins. Law § 3203(a)(1); *see also* Policy 4191 ("If the [other tests also fail], a Grace Period of 61 days starts on the Monthly Anniversary Date when the Net Cash Value is less than the Monthly Deduction . . . ."); *id.* ("A premium payment sufficient to keep this policy in force for three months is required and must be received prior to the last day of the Grace Period or this policy will Lapse.").

State law also provides that no life-insurance policy with variable premiums may:

> terminate or lapse by reason of default in payment of any premium . . . in less than one year after such default, unless . . . a notice shall have been duly mailed . . . no earlier than and within thirty days after the day when the insurer determines that the net cash surrender value under the policy is insufficient to pay the total charges that are necessary to keep the policy in force.

N.Y. Ins. Law § 3211(a)(1);[5] *see also* Policy 4191 ("At least 30 days prior to Termination, we

---

[4] The parties have agreed that New York law governs in this action. Joint Letter, ECF No. 38.
[5] Under the version of the statute in force when the policy here was issued, the notice was to be "mailed at least fifteen and not more than forty-five days prior to the day when [the] payment becomes due."
§ 3211(a)(1) (McKinney 1994). Which version of the statute applies is irrelevant to my decision.

7

will send written notification to your last known address advising that the Grace Period has begun."). This notice must "state the amount of such payment" due. § 3211(b)(2). "[T]he statute does not explicitly state that the amount given in the notice must be correct," but federal courts have predicted that the New York Court of Appeals "would invalidate a notice that misstated the premium due, as long as the misstatement was not de minimis." *Lebovits v. PHL Variable Ins. Co.*, 199 F. Supp. 3d 678, 680 (E.D.N.Y. 2016); *accord Blau v. Allianz Life Ins. Co. of N. Am.*, No. 14-CV-3202 (NGG) (VMS), 2018 WL 949222, at *4–5 (E.D.N.Y. Feb. 16, 2018), *appeal dismissed*, No. 18-699 (2d Cir. July 11, 2018).

Here, it is undisputed that the policy failed all three tests on July 7, 2012, triggering the beginning of the grace period, and that the defendant, on August 7, 2012, sent the plaintiff a notice informing him that the trust had to pay $116,511.94 by September 7, 2012. Pl.'s 56.1 Statement ¶¶ 17–18; Def.'s 56.1 Statement ¶ 25. And it is undisputed that $116,511.94 was enough to keep the policy in force until at least November 7, 2012. *See* Pl.'s 56.1 Statement ¶ 23. That is, the amount due was enough to satisfy the trust's July 7 shortfall and the trust's August 7, September 7, and October 7 obligations—keeping the policy in force for *four* months from July 7, the date that the policy's cash value was deemed insufficient.

Although the policy's language is not entirely clear, the statute is: the defendant demanded at least one month's premium more than it was entitled to. *See Lebovits*, 199 F. Supp. 3d at 681 ("[Section 3203's] requirements are deemed incorporated into the Policy."). Because an additional month's premium is not de minimis, the grace notice was legally invalid, and thus the policy did not lapse in September 2012. *Cf. id.* at 682 ("Because PHL's notices did not correctly state the amount due, it was not entitled to lapse the policy on August 22, 2010.").

8

The defendant argues that "the Policy itself does not contain a provision requiring grace notices to state the amount due" and that it is not "otherwise required to provide such information to the policy owner." Def.'s Br. 11. It's true that the defendant did not obligate itself to include the amount due in the grace notice, but section 3211(b)(2) of the state insurance law unambiguously requires it (*see Blau*, 2018 WL 949222, at *4; *Weiss v. Lincoln Nat'l Life Ins. Co.*, No. 14-CV-4944 (ERK) (JO), 2016 WL 4991533, at *4 (E.D.N.Y. Sept. 15, 2016); *Lebovits*, 199 F. Supp. 3d at 680). Thus, while the defendant may be correct that it was "not a breach of contract" for it to fail "to provide the correct amount in the grace notice" (Def.'s Opp'n 15, ECF No. 53), that failure meant that the grace notice was legally insufficient to trigger a lapse of the policy (*see Lebovits*, 199 F. Supp. 3d at 680–81).

Finally, the defendant opposes the plaintiff's motion on the ground that "[t]he undisputed facts do not indicate what amount should have been included on the grace notice." Def.'s Opp'n 8. It points to the "varying expert accounts regarding the correct amount" as evidence that "disputed factual issues . . . preclude summary judgment for plaintiff." *Id.* at 8–9. Whereas the plaintiff has retained an expert, who has reasonably attempted to calculate how much the trust owed on the policy (*see* BenHaim Aff., Ex. C),[6] the defendant neither asserts a different amount owed nor explains what, if anything, is incorrect about the plaintiff's expert's calculations. *Cf. Blau*, 2018 WL 949222, at *5 ("Neither Defendant nor Defendant's expert rebuts the premium payment amount offered by Plaintiff's expert, nor does either articulate how Defendant arrived at the [$116,511.94] figure."). The defendant appears content to leave the matter unsettled.

---

[6] I acknowledge that the plaintiff has endeavored to determine how much was owed on the policy when it entered the grace period, but I do not rely on any of the plaintiff's expert's conclusions.

9

But the defendant cannot evade summary judgment that easily. Although the exact amount that the trust was overcharged is unknown, it is undisputed that the trust was charged for *at least* three full months in addition to the month for which a balance was owing. *See* Pl.'s 56.1 Statement ¶ 23. As discussed above, that is enough to find a violation of section 3203(a)(1), and thus any dispute over how much more than that the trust was overcharged is immaterial for purposes of summary judgment.

B.  **The defendant repudiated the contract by insisting on the reinstatement procedure, obviating any required tender of premium.**

The defendant argues that none of the foregoing really matters, because section 3211 requires a legally valid notice only for the lapse of a life-insurance policy "in less than one year after [the] default." § 3211(a)(1); *see* Def.'s Opp'n 9. Thus, "even if no notice or an incorrect notice is provided, a life insurance policy will lapse within one year of the date of default in premium payments." Def.'s Opp'n 11; *see also Blau*, 2018 WL 949222, at *6 ("After a year of nonpayment, the insurer may lapse the policy without any notice."); *Lebovits*, 199 F. Supp. 3d at 681 ("Although noncompliance with § 3211 means that an insurer cannot lapse the policy within one year of the default, it may still lapse the policy after that period."). "Because plaintiff failed to tender premiums when due, or within one year thereafter," the defendant argues, "the Policy lapsed for nonpayment of premiums." Def.'s Br. 17.

The defendant is right on the law but wrong on the application. The invalid grace notice matters, because whether the policy lapsed in September 2012 is relevant to whether the defendant's subsequent conduct amounted to a repudiation of the contract. *See* Pl.'s Opp'n 14, ECF No. 49 (arguing that "Allianz prevented the Halberstams from paying premiums by advising the Halberstams that payment will not be accepted without new underwriting"); *cf. Jakobovits v. Alliance Life Ins. Co. of N. Am.*, No. 15cv9977, 2017 WL 3049538, at *6 (S.D.N.Y. July 18, 2017) ("Because Plaintiff . . . materially breached by failing

to pay any premiums, Allianz is entitled [to] summary judgment unless Allianz itself breached and thereby caused the policy owner[] to stop paying.").

   *1. The defendant's insistence on a new underwriting and medical review went beyond the contract and amounted to a repudiation.*

"Under New York law, insistence upon terms which are not contained in a contract constitutes an anticipatory repudiation thereof." *REA Express, Inc. v. Interway Corp.*, 538 F.2d 953, 955 (2d Cir. 1976); *accord Created Gemstones, Inc. v. Union Carbide Corp.*, 391 N.E.2d 987, 990 n.5 (N.Y. 1979). "Repudiation 'can consist of . . . an indication that the renouncing party will perform only if certain "extracontractual" conditions are satisfied.'" *In re Best Payphones, Inc.*, 432 B.R. 46, 54 (S.D.N.Y. 2010) (quoting *Palazzetti Imp./Exp., Inc. v. Morson*, No. 98 Civ. 722(FM), 2001 WL 1568317, at *9 (S.D.N.Y. Dec. 6, 2001)), *aff'd*, 450 F. App'x 8 (2d Cir. 2011); *accord SPI Commc'ns, Inc. v. WTZA-TV Assocs. Ltd. P'ship*, 644 N.Y.S.2d 788, 790 (App. Div. 1996) ("An anticipatory repudiation . . . can be grounded upon a finding that the other party . . . has communicated its intent to perform only upon the satisfaction of extracontractual conditions . . . ."). "If a party to a contract demands of the other party a performance to which he has no right under the contract and states *definitively* that, unless his demand is complied with, he will not render his promised performance, an anticipatory repudiation has been committed." *In re Best Payphones*, 432 B.R. at 54 (quoting *Tex. Trading & Milling Co. v. H.I.T. Corp.*, No. 84 Civ. 3776 (LLS), 1986 WL 9792, at *9 (S.D.N.Y. Sept. 3, 1986)).

New York courts have long applied the doctrine of repudiation in the life-insurance context. *See, e.g., Shaw v. Republic Life Ins. Co.*, 69 N.Y. 286, 292–93 (1877) ("Where one party to a contract declares to the other party to it, that he will not make the performance on the future day fixed by it therefor, and does not . . . withdraw his declaration, the other party is

excused from performance on his part . . . .").[7] When a life-insurance company repudiates its contract, either by terminating the policy outright or by insisting on extracontractual performance as a condition of continued coverage, the company cannot then rely on the policyholder's failure to tender premiums in arguing that the policy has lapsed. *See In re Preston's Will*, 278 N.E.2d 623, 625–26 (N.Y. 1972) ("[T]he cancellation of a policy, even if wrongful, is tantamount to a refusal to accept a premium even if tendered and thus there is a waiver of any claim of policy lapse."); *Kenyon v. Nat'l Life Ass'n of Hartford*, 57 N.Y.S. 60, 72 (App. Div. 1899) ("Payment or tender of payment of premiums is not necessary where the insurers have already declared the policy forfeited, or done any other act which is tantamount to a declaration on their part that they will not receive it if tendered." (quoting treatise)).

Here, the plaintiff argues that, "[i]n every communication with the Halberstams, . . . Allianz advised that . . . [it] [would] reject payment" and "conditioned acceptance of any premiums upon reapplication and approval by underwriting." Pl.'s Br. 19.[8] Because "the

---

[7] The defendant objects to citation to decisions issued before 1896, on the ground that they predate the rule, now found in section 3211, that a life-insurance company may terminate a policy without notice after one year of default. *See* Def.'s Opp'n 11. This objection is meritless insofar as the cases are cited for propositions unrelated to the notice statute. *See also* Pl.'s Reply Br. 2–3, ECF No. 54 ("The insurance law maxim that a policy owner is excused from tendering premiums in the face of certain conduct by the insurance company is completely independent of any of § 3211's grace notice considerations and therefore, it makes no difference [when] the decisions establishing the maxim were issued . . . ." (footnote omitted)).

[8] The plaintiff further urges that the defendant had "predetermined" not to accept any application for reinstatement that the plaintiff might submit. Pl.'s Br. 19. There is meager support for this theory in the record, and the defendant flatly denies it (*see* 2d Anderson Decl. ¶ 6, ECF No. 53-2). What the defendant would have done if the plaintiff had submitted a reinstatement application is disputed—but ultimately immaterial.

The plaintiff also argues, at length, that "Allianz prevented the Halberstams from paying premiums . . . by refusing to disclose the amount due." Pl.'s Opp'n 14; *accord* Pl.'s Br. 19–20 ("In fact, tender would have been impossible as the Halberstams had no way of knowing on their own how much to tender and were never told by Allianz despite point-blank requests."). This argument is squarely contradicted by the undisputed facts. *See, e.g.*, Pl.'s 56.1 Statement ¶ 38 (quoting letter from defendant informing plaintiff that trust owed $181,260.46

12

August grace notice was defective," however, "the policy [had] not lapse[d]," and thus, the plaintiff argues, "Allianz's insistence on new medical underwriting was an unwarranted condition excusing plaintiff's failure to tender." Pl.'s Reply Br. 6, ECF No. 54.

The plaintiff's argument finds support in the case law. In *Te Bow v. Washington Life Insurance Co.*, 59 A.D. 310 (1901), *aff'd mem.*, 65 N.E. 1123 (N.Y. 1902), the Appellate Division of the New York Supreme Court was confronted with a dispute in which a life-insurance company wrongfully claimed that an insurance policy had lapsed and demanded "a physician's certificate of good health as a condition to the company's receiving the premium due." *Id.* at 311. The insured, unable to obtain such a statement, subsequently tendered no premium, and later died. *Id.* at 311–12. His wife sued for the insurance benefits; in response, the insurance company argued that the policy had lapsed for lack of premium paid, pointing out that "there never was at any time a refusal to accept the premium." *Id.* at 313. The court rejected this argument as "hypercritical":

> A declaration that a policy had lapsed, and can be reinstated by furnishing a satisfactory medical certificate, imports of necessity a denial of the right to reinstatement except upon the condition named. With the unauthorized cancellation of the policy, and a refusal to accept the premium except upon a condition which was unauthorized, the authorities are uniform to the effect that the defendant is estopped from claiming as a defense to this action that the premium has not been paid.

*Id.*; *see also Whitehead v. N.Y. Life Ins. Co.*, 6 N.E. 267, 272 (N.Y. 1886) ("The company cannot

---

on policy). The plaintiff argues that he couldn't believe the figures quoted in the reinstatement letters because he had been "told that the amounts cannot be calculated without going through reinstatement and that the amount [would] change after reinstatement." Pl.'s Reply Br. 11. It's true that he was told this. *See* Pl.'s 56.1 Statement ¶ 36. But it's also true that, apparently unconvinced by what he was told, he called the defendant back the very next day and was told the opposite—that the reinstatement application *would* tell him the amount of premium owed. *See id.* ¶ 37. Viewed in the light most favorable to the defendant, the record does not support the plaintiff's prevention argument.

13

depend upon a default to which its own wrongful act contributed, and but for which a lapse might not have occurred.").

The application of *Te Bow* to this case is straightforward. As in *Te Bow*, the defendant here asserted incorrectly that the policy had already lapsed. *See supra* Section A. And as in *Te Bow*, because the policy had purportedly lapsed, the defendant insisted that the policy would not be reinstated without a review of the insured's health. *See* Pl.'s 56.1 Statement ¶ 38. Indeed, the defendant was unequivocal that the "policy is not in effect and [the trust] do[es] not have coverage under it until . . . [it] ha[s] been approved for reinstatement." *Id.* (emphasis omitted); *cf. Kenyon*, 57 N.Y.S. at 70 ("The notice sent to the insured by the defendant was absolute and unequivocal, and . . . stated, in substance, that her policy had been canceled, and that all her rights thereunder had terminated . . . ."). And the defendant made clear that any premium tendered would "be credited only upon approval of reinstatement." Pl.'s 56.1 Statement ¶ 38. The plaintiff was thus absolved of any responsibility to tender premium. *See also Sullivan v. Indus. Benefit Ass'n*, 26 N.Y.S. 186, 190 (Gen. Term 1893) ("Ordinarily a tender is not necessary when the acts and conduct of the other party indicate that it will be futile.").

2. *The defendant's claimed good faith is immaterial.*

The defendant attempts to resist this conclusion by arguing that, "[c]ontrary to the facts in *Te Bow*, Allianz here did not impose any additional requirements as part of its reinstatement procedures, and as such, . . . Allianz's reliance upon the terms of the Policy [did not] constitute a repudiation." Def.'s Opp'n 25; *see also id.* at 24 (arguing that requiring plaintiff to go through "full underwriting" "obviously does not constitute a repudiation of the Policy" but rather "follow[s] the express terms of the Policy" (quoting Pl.'s Br. 15)). But that is sensible only if the policy had actually lapsed, thus requiring a reinstatement. As already explained, the policy remained in force throughout 2012 because the August 2012

14

grace notice was legally invalid, and thus the defendant's insistence in November 2012 that the policy go through the reinstatement process went beyond the parties' contract.

The defendant argues that "[a]n insurer does not repudiate a policy by relying upon and following its interpretation of provisions of the policy." Def.'s Br. 18. Because it was "endeavor[ing] to apply" the policy's terms, the defendant argues, I should not rule that it repudiated the contract. *Id.* at 19 (quoting *Jacobson v. Metro. Prop. & Cas. Ins. Co.*, 672 F.3d 171, 177–78 (2d Cir. 2012)). Although this argument has some force, I find that it ultimately fails.

"The test for an anticipatory repudiation is an objective one and good faith is immaterial." *Record Club of Am., Inc. v. United Artists Records, Inc.*, 643 F. Supp. 925, 939 (S.D.N.Y. 1986), *vacated on other grounds*, 890 F.2d 1264 (2d. Cir. 1989); *see also Roussalis v. Wyo. Med. Ctr.*, 4 P.3d 209, 255 (Wyo. 2000) ("[A] party's good faith will not prevent [a] statement from amounting to a repudiation." (quoting II E. Allan Farnsworth, *Farnsworth on Contracts* § 8.21 (1990))).[9] "An anticipatory repudiation may be based upon an erroneous contract interpretation just as it may be based upon a refusal to perform for any other reason." *Record Club*, 643 F. Supp. at 939. "A party therefore acts at its peril if that party, insisting on what it mistakenly believes to be its rights, refuses to perform its duty." *Roussalis*, 4 P.3d at 255 (quoting Farnsworth, *supra*, § 8.21). Although this rule may seem harsh, there is good reason for it. "Whatever the breaching party's state of mind, the impact on the innocent party is the same—he faces total loss of the repudiator's performance, to which the contract entitled him." *Record Club*, 643 F. Supp. at 939.

---

[9] The plaintiff disputes that the defendant was acting in good faith. *See, e.g.*, Pl.'s Opp'n 23. For the present purpose, I assume *arguendo* that the defendant's insistence upon a reinstatement application was done in good faith.

15

Authority relied upon by the defendant is not to the contrary. In *New York Life Insurance Co. v. Viglas*, 297 U.S. 672 (1936), the Supreme Court rejected a claim that a life-insurance company had repudiated its policy, stating that, "[f]ar from repudiating [the contractual] provisions," the insurance company "appealed to their authority and endeavored to apply them." *Id.* at 676. And the Court noted that "[t]here is nothing to show that the insurer was not acting in good faith in giving notice of its contention that the disability was over." *Id.* Critically, however, that case involved the denial of an insurance *claim*, but not a repudiation of the entire policy. *See id.* at 675; *see also Mobley v. N.Y. Life Ins. Co.*, 295 U.S. 632, 638 (1935) ("Mere refusal . . . to pay a monthly benefit when due is sufficient to constitute a breach of that provision, but it does not amount to a renunciation or repudiation of the policy."). As the Second Circuit has explained, "[r]epudiating an insurance policy is not the same as denying that the claim presented is covered by the terms of that policy." *Jacobson*, 672 F.3d at 177 (citing *Viglas*, 297 U.S. at 676). The *Jacobson* court followed *Viglas* because the insurer in *Jacobson* "did not disavow the policy, nor contend that it was not bound by its terms." *Id.* at 177–78. But here the defendant's disavowal was explicit: "**This policy is not in effect and you do not have coverage under it . . . .**" Pl.'s 56.1 Statement ¶ 38.[10]

---

[10] The defendant also cites to *Lowenstein v. Federal Rubber Co.*, 85 F.2d 129 (8th Cir. 1936), for the proposition that there is "no repudiation where [a] party 'undert[akes] to perform in good faith according to its interpretation' of the contract." Def.'s Br. 19 (quoting *Lowenstein*, 85 F.2d at 131); Def.'s Opp'n 25 (same). To the extent that that decision conflicts with my analysis above, it is contrary to the weight of authority (*see United Cal. Bank v. Prudential Ins. Co. of Am.*, 681 P.2d 390, 430 (Ariz. Ct. App. 1983) ("The *Restatement*, *Corbin*, and *Williston*—the three leading authorities on American contract law—unanimously endorse the position that an anticipatory repudiation may be based upon an erroneous contract interpretation just as it may be based upon a refusal to perform for any other reason.")), and I do not believe that the New York Court of Appeals would find it persuasive.

16

## C. The defendant's statute-of-limitations argument fails.

In my previous opinion in this case, I rejected the defendant's arguments that the plaintiff's claims were brought too late, ruling that the six-year limitations period for declaratory-judgment actions applies. *See* Op. & Order 16–17. Based on that ruling, the defendant maintains that the action was still brought too late, because the defendant "sent plaintiff its first grace notice on November 7, 2008," more than six years before the plaintiff filed his complaint. Def.'s Br. 22. Although it does not explicitly say so, the defendant appears to be arguing now that *all* the grace notices that it sent the plaintiff (*see* Def.'s 56.1 Statement ¶ 22 (listing dates of notices sent)) demanded too much money. By overcharging the trust for years before the plaintiff caught on, the defendant supposes that it is now insulated from suit.

This argument has multiple flaws. First, I see nothing in the record to support a finding that any of the previous grace notices violated the statute, and neither the plaintiff nor the defendant have even alleged that those notices were invalid. Second, regardless of whether any of the previous grace notices were deficient, none of them precipitated the purported policy lapse that is at issue in this lawsuit.

The plaintiff's cause of action accrued in 2012, and the plaintiff's complaint was filed in 2016. It was timely.[11]

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment is granted, and the defendant's motion for summary judgment is accordingly denied. But before the

---

[11] The plaintiff also raises several new arguments, based on various provisions of the New York insurance law, in his brief in opposition to the defendant's motion. *See* Pl.'s Opp'n 5–9. Because these arguments were not raised previously, and because I grant summary judgment to the plaintiff in any event, I do not address them.

17

policy can be declared "in good standing and in effect" (Pl.'s Mot. 1, ECF No. 52), the trust must become current on its premium obligations. *See, e.g.*, *Lebovits*, 199 F. Supp. 3d at 682. Accordingly, the parties are directed to make a good-faith effort to determine the amount of premium now owed under the policy, and to inform the court of the amount within thirty days of this order.

    So ordered.

                                                                 ___/s/_____
                                                                 Allyne R. Ross
                                                                 United States District Judge

Dated:        October 2, 2018
                Brooklyn, New York